# 12-1377-cv

## United States Court of Appeals

*for the*

## Second Circuit

─────── ◆ ───────

JACOBY & MEYERS LAW OFFICES, LLP, on behalf of itself and all other similarly situated entities authorized to practice Law in the State of New York, JACOBY & MEYERS USA, LLC,

*Plaintiffs-Appellants,*

— v. —

THE PRESIDING JUSTICES OF THE FIRST, SECOND, THIRD AND FOURTH DEPARTMENTS, APPELLATE DIVISION OF THE SUPREME COURT OF THE STATE OF NEW YORK,

*Defendant-Appellee.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFFS-APPELLANTS

MEISELMAN, DENLEA, PACKMAN,
  CARTON & EBERZ P.C.
JAMES R. DENLEA
JEFFREY I. CARTON
1311 Mamaroneck Avenue
White Plains, New York 10605
(914) 517-5000

*Attorneys for Plaintiffs-Appellants*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellant Jacoby & Meyers Law Offices, LLP hereby certifies pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Plaintiff-Appellant Jacoby & Meyers USA, LLC hereby certifies pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Jacoby & Meyers Law Offices, LLP and Jacoby & Meyers USA, LLC shall be referred to collectively herein as "Jacoby & Meyers."

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..........................................................1

QUESTION PRESENTED .................................................................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF FACTS ...............................................................3

    A.   New York's Rule of Professional Conduct 5.4.............................................3

    B.   Jacoby & Meyers' History of Innovation ....................................4

    C.   Jacoby & Meyers Requires Additional, Outside Capital.............................6

    D.   The Proceedings Below ...............................................8

SUMMARY OF ARGUMENT ...........................................................10

ARGUMENT .......................................................................12

    THE DISTRICT COURT ERRED IN FINDING THAT
    JACOBY & MEYERS LACKS STANDING TO CHALLENGE
    THE CONSTITUTIONALITY OF RULE 5.4....................................12

POINT I:

    THE DISTRICT COURT MUST DECIDE THE CONSTITUTIONALITY
    OF THE DEFENDANTS' ACTION, REGARDLESS OF WHETHER
    OTHER STATE ACTORS ARE ALSO ENGAGED IN
    UNCONSTITUTIONAL ACTION ..............................................14

i

# **TABLE OF CONTENTS**
### (Cont'd)

**Page**

POINT II:

    THE SOURCE OF PLAINTIFFS' INJURY IS THE BLANKET
    PROSCRIPTION OF NON-LAWYER INVESTMENT IN LAW FIRMS,
    WHICH VIOLATES THE FIRST AMENDMENT RIGHTS OF
    ASSOCIATION AND ACCESS TOTHE COURTS ........................................ 19

POINT III:

    JUDICIARY LAW SECTION 495 AND THE LIMITED LIABILITY
    COMPANY LAW DO NOT PROHIBIT JACOBY & MEYERS
    FROM ACCEPTING NON-LAWYER INVESTMENTS ................................ 26

    A.   Judiciary Law Section 495 Does Not Prohibit Jacoby &
         Meyers LLC From Accepting Non-Lawyer Equity Investments ............... 26

    B.   The Option To Form A Professional Service Limited Liability
         Company To Practice Law Does Not Preclude A Limited
         Liability Company From Practicing Law ................................................... 30

CONCLUSION ...................................................................................................... 32

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ...................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

*Alliant Energy Corp. v. Bie,*
    277 F.3d 916 (7th Cir. 2002) ...................................................................... 13, 14

*Bailey v. Broder,*
    No. 94 CIV. 2394 (CSH), 1997 WL 73717  (S.D.N.Y. Feb. 20, 1997)..............28

*Bates v. The State Bar of Arizona,*
    433 U.S. 350 (1977) .................................................................................. 19, 24

*Brotherhood of Railroad Trainmen v. Virginia,*
    377 U.S. 1 (1964) ...................................................................................... 18, 22

*Brown v. Board of Education,*
    347 U.S. 483 (1954) ........................................................................................15

*Citizens United v. Federal Election Commission,*
    -- U.S. --, 130 S.Ct. 876 (2010) ............................................................ 20, 24, 29

*Cooper v. Aaron,*
    358 U.S. 1 (1958) ................................................................................... passim

*Eli v. Apker,*
    No. 05 CIV. 2703 (DC), 2005 WL 2848956  (S.D.N.Y. Oct. 28, 2005) .............30

*Ex parte Virginia,*
    100 U.S. 339, 347 (1879) .................................................................................17

*F & W Oldsmobile, Inc. v. Tax Comm'n,*
    106 A.D.2d 792 (3d Dep't 1984) .......................................................................30

*First Nat'l Bank of Boston v. Bellotti,*
    435 U.S. 765 (1978) .........................................................................................29

*Fong Foo v. United States,*
    369 U.S. 141 ......................................................................................................29

iii

# TABLE OF AUTHORITIES
## (Cont'd)

<u>**Cases**</u>                                                                                            <u>**Page**</u>

*Horne v. Flores,*
   -- U.S. --, 129 S.Ct. 2579 (2009) ........................................................................12

*In re Co-operative Law Co.,*
   198 N.Y. 479 (1910)........................................................................ 27, 28, 29

*Lermann v. Bd. of Elections,*
   232 F.3d 135 (2d Cir. 2000) ...........................................................................13

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ........................................................................................13

*Marbury v. Madison,*
   1 Cranch 137 , 2 L.Ed. 60 (1803) ..................................................................14

*Monsanto Co. v. Geertson Seed Farms,*
   -- U.S. --, 130 S.Ct. 2743 (2010) ...................................................................12

*NAACP v. Button,*
   371 U.S. 415 (1963) ..................................................................................21- 25

*Pappas v. Tzolis,*
   87 A.D.3d 889 (1st Dep't 2011) .....................................................................31

*Sullivan v. Town of Salem,*
   805 F.2d 81 (2d Cir. 1986) .............................................................................30

*Thompson v. County of Franklin,*
   15 F.3d 245 (2d Cir. 1994) .............................................................................13

*United Mine Workers of America, Dist. 12 v. Illinois State Bar Association,*
   389 U.S. 217 (1967) ................................................................................. 23, 24

*United States v. City of Yonkers,*
   856 F.2d 444(2d Cir. 1988), rev'd ..................................................................15

## <u>TABLE OF AUTHORITIES</u>
(Cont'd)

<u>**Cases**</u> <u>**Page**</u>

*United Transportation Union v. State Bar of Michigan,*
  401 U.S. 576 (1971) ........................................................................24

<u>**Statutes**</u>

28 U.S.C. § 1291 ..............................................................................1

28 U.S.C. § 1331 ..............................................................................1

28 U.S.C. 1332(c)(1) .......................................................................29

42 U.S.C. § 1983 ..............................................................................1

N.Y. Jud. L. § 495 .................................................................. passim

N.Y. LIAB. CO. LAW § 101 ..............................................................27

N.Y. LIAB. CO. LAW § 201 ..............................................................27

N.Y. Tax Law § 658..........................................................................29

U.S. Const., Art. 6, Cl. 2 ..................................................................15

<u>**Rules**</u>

F.R.A.P. 4(a)(1)(A) ............................................................................1

Fed. R. App. P 32(a) .........................................................................33

<u>**Other Authorities**</u>

Clifford Winston and Robert W. Crandall, *The Law Firm Business
  Model Is Dying*, THE WALL STREET JOURNAL, May 29, 2012, at A13 ...............26

## JURISDICTIONAL STATEMENT

This action is a constitutional challenge, pursuant to 42 U.S.C. § 1983, to a state regulation that acts as a blanket suppression of First Amendment rights. The district court had federal question jurisdiction pursuant to 28 U.S.C. § 1331.

Jurisdiction in this Court is based upon 28 U.S.C. § 1291, in that this is an appeal from a final judgment of the district court disposing of all claims by all parties.

The final judgment was entered on March 14, 2012 and the notice of appeal was filed on April 5, 2012. Thus, this appeal is timely. F.R.A.P. 4(a)(1)(A).

## QUESTION PRESENTED

1. Did the trial court err when it concluded that Jacoby & Meyers lacks standing to assert its claims that Rule 5.4 of the New York Rules of Professional conduct violates, *inter alia*, the First Amendment of the United States Constitution because, even if Rule 5.4 is invalidated, other unnamed state actors will continue violating Jacoby & Meyers' same constitutional rights?

Answer: Yes. The district court erred in finding that Jacoby & Meyers lacks standing to challenge Rule 5.4's blanket suppression of its First Amendment rights to ensure meaningful access to the courts. The district court's ruling failed to recognize that if the federal judiciary determines that a named defendant is

1

violating a plaintiff's constitutional right, then not only the named defendant, but also any unnamed state actors, are constitutionally obligated to uphold the plaintiff's exercise of the same federal constitutional right. Thus, if Rule 5.4 is determined to violate Jacoby & Meyers' constitutional rights of association and access to courts, so too would any other state statute that likewise suppresses the same rights be constitutionally infirm.

## STATEMENT OF THE CASE

By this action, Jacoby & Meyers seeks to have Rule 5.4's blanket prohibition of non-lawyer investment in law firms declared unconstitutional as a violation of, *inter alia,* its First Amendment rights to associate to ensure meaningful access to the courts. The Defendants moved to dismiss the Amended Complaint on the grounds that Jacoby & Meyers lacks standing to pursue its claims.

In ruling on Defendants' motion to dismiss the Amended Complaint, the district court erroneously concluded that even if Rule 5.4 were declared unconstitutional, the activity at issue – non-lawyer equity investment in law firms – would nevertheless be prohibited by New York Judiciary Law §495 and therefore a ruling on Jacoby & Meyers' challenge to Rule 5.4 would amount merely to an "advisory declaration." This conclusion ignores the fundamental truth that if the federal judiciary determines that a constitutional right is being violated, all state

actors, not merely the named defendant, are constitutionally obligated to uphold the plaintiff's exercise of the same federal constitutional right. The district court's failure to adhere to this rule of law dictates that its decision dismissing Jacoby & Meyers' Amended Complaint for lack of standing be reversed and the matter allowed to proceed to a substantive determination on its merits.

## STATEMENT OF FACTS

### A.  New York's Rule of Professional Conduct 5.4

On or about December 16, 2008, then-Chief Judge Judith S. Kaye, the Chief Judge of the New York Court of Appeals, and the Presiding Justices of the Appellate Division, announced a new set of attorney conduct rules for New York. These new Rules of Professional Conduct, effective April 1, 2009, were issued as Joint Rules of the Appellate Divisions, and constitute Part 1200 of the New York Court Rules. These rules expressly supersede the Disciplinary Rules which had previously governed the conduct of New York attorneys. The new Rules of Professional Conduct are based upon the American Bar Association Model Rules that have been implemented in virtually every jurisdiction in the United States, with the critical exception of a jurisdiction which is the seat of many of the most powerful law firms in the country – namely, the District of Columbia. (A-213).

The Rules of Professional Conduct apply to all attorneys admitted to practice in New York State (either generally or for purposes of a particular proceeding),

including out-of-state or foreign attorneys, regardless of where the attorneys'

conduct occurs. *See Rule 8.5: Disciplinary Authority and Choice of Law*. (A-213).

Rule 5.4 addresses the "Professional Independence of a Lawyer." Rule 5.4

provides, in pertinent part, as follows:

> (a)　　A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

> \*　\*　\*

> *(b)　　A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if*:

>> (1)　　a non-lawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

Rule 5.4 (emphasis added). (A- 213-214).

As a result of this rule, Jacoby & Meyers cannot allow a non-lawyer to

acquire or own an interest in the legal entity (i.e., the law firm) through which it

provides legal services to its clients. (A-214).

## B.　　Jacoby & Meyers' History of Innovation

Jacoby & Meyers was founded in September 1972, when Stephen Z. Meyers

and Leonard D. Jacoby, law school classmates at UCLA, opened its first storefront

office in Van Nuys, California. In creating their law practice, Messrs. Jacoby and

Meyers sought to ensure that people of modest means, who could often not access

4

the legal system due to an inability to afford a lawyer, had a practical outlet to obtain competent, qualified counsel at reasonable rates. (A-215). Since the firm began its operations nearly forty years ago, Jacoby & Meyers has become synonymous with legal services for the masses and has been at the vanguard in overturning vestigial regulations that impede access to the legal system, including attorney advertising. (A-215).

Jacoby & Meyers has continued to innovate through the years – all in an effort to help provide quality legal services to clientele at reasonable fees. Jacoby & Meyers opened branch offices in retail shopping centers, maintained Saturday and evening office hours, and was the first law firm to accept credit cards for payment. (A-216). The firm developed detailed written systems to standardize the handling of cases, expediting the progress of the case and allowing for more efficiency and quality control. Similarly, the firm took an innovative approach to hiring. The firm employed lawyers whose practices were devoted to a particular area of law such as bankruptcy, personal injury, or criminal law, and then assigned these specialists to multiple offices.

Regardless of innovations to its form, throughout its forty year history, Jacoby & Meyers has always comported itself with the highest regard for its ethical and professional responsibilities and has zealously represented the nearly one million clients it has been privileged to serve.

5

C.   **Jacoby & Meyers Requires Additional, Outside Capital**

Jacoby & Meyers intends to expand its operations, hire additional attorneys and staff, acquire new technology, and improve its physical offices and infrastructure to increase its ability to serve its existing clients and to attract and retain new clients and qualified attorneys.  Notably, Jacoby & Meyers' business plans principally concern expansion within communities in which working-class, blue-collar and immigrant families reside.  Indeed, as Chief Judge Jonathan Lippman remarked in his 2011 State of the Judiciary Speech, it is often "the most vulnerable in our society" for whom the courthouse doors must be kept open.  (A-217).

In order to ensure the public's greatest possible access to legal representation and protection of their rights through the civil justice system in an affordable, cost-effective way, Jacoby & Meyers requires a substantial infusion of new capital.  Because of the proscriptions of Rule 5.4, however, law firms such as Jacoby & Meyers have been relegated to obtaining capital from (i) the personal contributions of the partners, (ii) retained earnings on fees generated and collected, and (iii) commercial bank loans, with onerous rates of interest.  (A-218).

In these challenging economic times, these "normal" channels of capital infusion are either too expensive or unavailable to fund Jacoby & Meyers' and

other class members' intended business plans.[1] Because of the proscriptions of Rule 5.4, Jacoby & Meyers has been unable to entertain the numerous offers it has received from prospective non-lawyer investors, both within and without the State, who are prepared to invest capital in exchange for owning an interest in the firm. (A-218).

Specifically, several high-net individuals including, but not limited to Michael Ostrow, Anthony Costa, and Philip Guarnieri, as well as several institutional investors (whose identities Jacoby & Meyers has been asked to keep confidential) have expressed their commitment to invest significant sums of money in Jacoby & Meyers in exchange for owning an interest (specifically, a share of the anticipated profits) in the entity through which Jacoby & Meyers practices law. Each of these investors understands that the law firm shall be managed by "managers" (and not its members), each of whom is an attorney duly licensed to practice law in New York; that the duties and responsibilities of these managers shall be set forth in the law firm's articles of organization; and that the managers shall ensure that client confidences and the lawyers' independence of professional judgment are at all times preserved. (A-218-219).

---

[1] Indeed, one look no further than the recent bankruptcy of Dewey & LeBoeuf to recognize the crushing burden being shouldered by law firms that do not have access to competitive sources of capital.

In order to help facilitate these investments, Jacoby & Meyers has filed and registered with New York State the initial articles of organization of Jacoby & Meyers USA, LLC, a New York limited liability company to which Jacoby & Meyers is prepared to immediately transfer all of its assets to continue its practice of law. But for the proscriptions of Rule 5.4, however, Jacoby & Meyers would have already consummated these transactions and allowed non-lawyers an interest in the legal entity through which it practices law. (A-219).

## D.  The Proceedings Below

On May 18, 2011, Jacoby & Meyers commenced the underlying action in the United States District Court for the Southern District of New York to challenge the antiquated and unconstitutional Rule 5.4. Jacoby & Meyers' complaint alleges that Rule 5.4 violates the First Amendment, the Dormant Commerce Clause and Equal Protection and Due Process Clauses of the Fourteenth Amendment. Jacoby & Meyers brought these claims in federal court because it is the province of the federal judiciary to assess Jacoby & Meyers' constitutional claims. Moreover, if the claims were instead brought in state court, the New York State judiciary would be asked, in essence, to judge the legality of rules it promulgated and to place itself in a conflict position – creating the appearance of impropriety and undermining public confidence in the judiciary.

8

Defendants-Appellees moved to dismiss Jacoby & Meyers' complaint on a number of grounds, including that Jacoby & Meyers allegedly lacked standing to pursue its claims because, *inter alia*, Jacoby & Meyers' complaint did not allege that Jacoby & Meyers had a transaction in place, or was prepared to go forward with a transaction, that would be prohibited by Rule 5.4.

On November 3, 2011, Judge Kaplan heard oral argument on Defendants-Appellees' motion to dismiss. The court focused entirely on the issue of standing and declined to address the merits of Jacoby & Meyers' claims.

Ultimately, Jacoby & Meyers agreed to amend its complaint to specifically address the standing issue and the concerns raised by the court. (A-264). On November 23, 2011, Jacoby & Meyers filed its Amended Complaint, naming Jacoby & Meyers USA, LLC as an additional plaintiff and alleging specific facts as to the individuals ready to invest in Jacoby & Meyers and the structure of that proposed transaction. (A-218-219, 222-224). On December 23, 2011, Defendants-Appellees moved to dismiss the Amended Complaint. (A-4).

In his Memorandum Opinion dated March 8, 2012, the district court ignored the Amended Complaint's specific allegations of standing (the truth of which it was required to assume on a motion to dismiss), and held that Plaintiffs lacked standing. In so holding, the district court failed to determine whether Rule 5.4 violated Plaintiffs' constitutional rights, a determination which was necessary in

9

order to assess whether the alleged constitutional violation caused Plaintiffs' injury.

Because Judge Kaplan erred in his conclusion that Jacoby & Meyers does not have standing to challenge Rule 5.4, Plaintiffs-Appellants timely appealed the district court's decision to this Court.

## SUMMARY OF ARGUMENT

The district court had an unflagging obligation to hear Jacoby & Meyers' federal constitutional challenge to Rule 5.4. Indeed, it is a well-settled principle of constitutional law that the supremacy of the United States constitution requires contrary, conflicting state laws and policy to yield where they impede implementation of federal constitutional guarantees. Here, the lower court failed to consider the constitutional underpinnings upon which Plaintiffs' claims are predicated, choosing instead to avoid the issues altogether by contending that its ruling would amount only to an advisory declaration. To the contrary, under the Supreme Court's clear rules of standing, the lower courts *must* examine whether the alleged constitutional violation was the source of the plaintiff's alleged injury. That is, the district court is required to determine whether the plaintiff's claimed injury is caused by a state rule or action that constitutes a putative constitutional violation.

10

The United States Supreme Court has repeatedly reaffirmed that regulations which encroach, in absolute terms, on fundamental rights guaranteed by the United States constitution are fatally infirm. In fact, it is the blanket suppression of First Amendment rights that the highest court has routinely struck down as constitutionally suspect. Whether it concerned a lawyer's right to advertise, or a corporation's right to participate in political speech, the Supreme Court has been unwavering in its position that rules which amount to a blanket suppression or absolute proscription of fundamental First Amendment rights are anathema to the Constitution. Here, application of this principle of law requires reversal of the lower court's ruling.

Judge Kaplan credited the Attorney General's unsupported assertion that because other state laws purportedly preclude Jacoby & Meyers from granting an equity interest to a non-lawyer – which they do not – a ruling invalidating Rule 5.4 would not redress the harm to Jacoby & Meyers caused by it. This position, however, is fundamentally flawed in that it fails to recognize the supremacy of federal law and the preclusive effect the ruling sought by Jacoby & Meyers would have on any other state law likewise prohibiting such investment. In other words, if the district court were to strike down Rule 5.4, that ruling would take precedence and any state statute conflicting with that ruling would also be unconstitutional. Judge Kaplan essentially ruled that a multiplicity of unconstitutional laws will lend

11

support to each other, such that they provide scaffolding to cure any constitutional infirmity. The plural of unconstitutional, however, is not legitimacy.

Moreover, in addition to the supremacy of federal law, the district court erred in finding that the New York LLC law prohibits Jacoby & Meyers from practicing law as an LLC. New York's LLC law provides that a limited liability company may be formed for any "lawful business purpose," which is defined to include "professions" such as the practice of law. Because there is nothing on the face of the LLC law that prohibits a law firm from taking the form of an LLC, the lower court erred in concluding that Jacoby & Meyers' standing to bring this action is lacking. The district court's dismissal of the Amended Complaint should therefore be reversed.

## ARGUMENT

### THE DISTRICT COURT ERRED IN FINDING THAT JACOBY & MEYERS LACKS STANDING TO CHALLENGE THE CONSTITUTIONALITY OF RULE 5.4

As the Supreme Court has repeatedly explained, "Article III standing requires an injury that is (i) concrete, particularized, and actual or imminent, (ii) fairly traceable to the challenged action, and (iii) redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, -- U.S. --, 130 S.Ct. 2743, 2752 (2010) (citing *Horne v. Flores*, -- U.S. --, 129 S.Ct. 2579, 2591-2592 (2009)). The court below found standing lacking based on its interpretation of the second and

third prongs of this test.  It focused its inquiry on "whether Rule 5.4 is causing plaintiffs' alleged injury and whether the ruling they seek, a declaration that Rule 5.4 is unconstitutional, would eliminate it."  (SPA-7-8).

Thus, the inquiry on this appeal is whether a favorable ruling would redress the harm being inflicted upon Jacoby & Meyers by Rule 5.4.  This Court undertakes this inquiry *de novo,* taking as true all facts alleged by Jacoby & Meyers.  *See Thompson v. County of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (*de novo* review); *Lermann v. Bd. of Elections*, 232 F.3d 135, 142 (2d Cir. 2000) ("Since this case remains at the pleading stage, all facts averred by the plaintiffs must be taken as true for the purposes of the standing inquiry…").

Where, as here, the plaintiff itself is the subject of the government action (or inaction) at issue, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Indeed, in *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002) (Easterbrook, J.), the court held that the plaintiff had standing to challenge a statute constraining equity investment in a company because it necessarily caused the plaintiff's costs of obtaining capital to increase, thereby causing injury sufficient to establish standing.  *Id.* at 920.  In so holding, the court reiterated that "complaints need not be elaborate, and in this respect injury (and thus standing) is no different from any

13

other matter that may be alleged generally." *Alliant*, 277 F.3d at 919 (citation

omitted).

Because the district court erred in concluding that a favorable ruling would

not redress the harm to Jacoby & Meyers, the decision below should be reversed.

## POINT I:

### THE DISTRICT COURT MUST DECIDE THE CONSTITUTIONALITY OF THE DEFENDANTS' ACTION, REGARDLESS OF WHETHER OTHER STATE ACTORS ARE ALSO ENGAGED IN UNCONSTITUTIONAL ACTION

The "Supremacy Clause" of the United States Constitution, provides:

> This Constitution, and the Laws of the United States which
> shall be made in pursuance thereof; and all treaties made, or
> which shall be made, under the authority of the United States,
> shall be the supreme law of the land; and the judges in every
> state shall be bound thereby, anything in the Constitution or
> the Laws of any state to the contrary notwithstanding.

U.S. Const., Art. 6, Cl. 2. In *Cooper v. Aaron*, 358 U.S. 1 (1958), the Supreme

Court confirmed the supremacy of federal law and the federal judiciary's

interpretation of that law when it pronounced:

> It is emphatically the province and duty of the judicial
> department to say what the law is. This [Court's] decision [in
> *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803)]
> declared the basic principle that the federal judiciary is
> supreme in the exposition of the law of the Constitution, and
> that principle has ever since been respected by this Court and
> the Country as a permanent and indispensable feature of our
> constitutional system.

14

358 U.S. at 18; *see also United States v. City of Yonkers*, 856 F.2d 444, 455 (2d

Cir. 1988), *rev'd sub nom on other grds* ("[t]he supremacy of federal law, including

federal court orders to remedy violations for federal constitutional and statutory

violations, prevails [sic] over conflicting state law.").

More importantly, as detailed below, *Cooper v. Aaron* stands for the more

specific proposition that a federal court must decide the constitutionality of a

named defendant's action, regardless whether other state actors (not named as

defendants) are also preventing the plaintiff's exercise of the same constitutional

right.  Those other unnamed state actors are obliged by the Supremacy Clause to

honor the plaintiff's constitutional right.  The possibility that they will continue to

violate that right is no ground for a court's refusal to strike down the

unconstitutional action of the named defendant.  One state actor's violation of

federal constitutional rights does not insulate another state actor's violation of the

same rights, nor does it absolve the federal court of the responsibility of ruling on

the constitutionality of the latter's actions.

In *Cooper v. Aaron*, the plaintiffs sued the Little Rock School Board in

federal district court for its failure to desegregate the schools in violation of the

constitutional principle enunciated in *Brown v. Board of Education,* 347 U.S. 483

(1954).  The plaintiffs did not bring suit against any other state legislative,

executive, or judicial official.  The district court approved a desegregation plan

15

adopted by the board. *Cooper*, 358 U.S. at 8. Subsequently, the school board petitioned the court for a stay of the desegregation order. They asserted that the Board's failure to comply with the plaintiffs' constitutional rights should be absolved by the ongoing violation of those rights by other state executive and legislative officials. *See id*. at 12. The Court noted that:

> [i]n its petition for certiorari filed in this Court, the School Board itself describes the situation in this language: 'The legislative, executive, and judicial departments of the state government opposed the desegregation of Little Rock schools by enacting laws, calling out troops, making statements vilifying federal law and federal courts, and failing to utilize state law enforcement agencies and judicial processes to maintain public peace.'

*Id.* at 15.

The school board therefore argued, like the defendants in this case, that even if it in good faith complied with the plaintiffs' constitutional right, other state actors would block the plaintiffs from exercising what the Court had determined to be the plaintiffs' fundamental constitutional birth-right. The Supreme Court "accepted without reservation the position of the School Board" that even if it in good faith sought to comply with the plaintiffs' right of equal protection, "the actions of legislators and executive officials of the State of Arkansas" implacably blocked school integration. *Id.* at 14-15. Nonetheless the Court, in unusually vehement language, rejected the School Board's plea to shield its own acts of *de jure* segregation. The Court ruled that the obstruction to desegregation by the

16

action of other state agencies and other state officials did not neutralize the

obligation of the Court to enforce the plaintiffs' rights against the defendant school

board. *Id*. at 15.

In sum, the Supreme Court rejected the argument that a named defendant

need not comply with a constitutional right by virtue of the fact that other unnamed

state actors are also violating the very same right. The Court's conclusion rested

on the fundamental principle "that *no agency of the state*" may violate a

constitutional right; and, conversely, *every* state executive, legislative, and judicial

official is bound to comply with the federal judiciary's enunciation of a plaintiff's

rights. *Id*. at 17 (emphasis added). "*Whoever*, by virtue of public position under a

State government,…denies or takes away [a constitutional right] violates the

constitutional inhibition….This must be so, or the constitutional prohibition has no

meaning.'" *Id.* at 17, quoting *Ex parte Virginia*, 100 U.S. 339, 347 (1879)

(emphasis added).

Hence, by employing a *tu quoque* rationalization, relative to the

unconstitutional actions of New York executive officials enforcing other New

York statutes, the Presiding Justices of the Appellate Division cannot escape a

federal judicial determination of the unconstitutionality of their own actions.

A decision by the lower court striking down Rule 5.4 as unconstitutional

would constitute supreme federal law and would necessarily trump any state law

17

that conflicts with it. It is not necessary for Jacoby & Meyers to have challenged each and every state statute that may be applied to preclude non-lawyer investments in a law firm. If Rule 5.4's absolute prohibition is declared unconstitutional, so too will any other state statute, whether directly challenged or not, that prohibits the same conduct be deemed to be constitutionally infirm. *See Brotherhood of Railroad Trainmen v. Virginia*, 377 U.S. 1, 8 (1964) ("Since the part of the [injunction] to which the Brotherhood objects infringes [its First and Fourteenth Amendment rights], it cannot stand; and to the extent any other part of the [injunction] forbids these activities it too must fall."). To hold otherwise, would be to cast aside the federal judiciary's supreme role over issues of constitutional law as articulated in *Cooper*. To circumvent federal review, all a state would need to do would be to enact two or more offending rules which, as here, the state would contend precluded federal scrutiny of the illegal regulations.

The district court's acceptance of Defendants-Appellees' argument that it may cure one infirm rule by reliance on others that suffer from the same constitutional infirmity creates a logical tautology which, taken to its illogical conclusion, would effectively preclude review of either rule. Accepting this reasoning would mean that, for example, if a state were to enact two blanket restrictions upon a woman's right to vote, neither could be challenged individually by a woman wishing to vote because she would lack standing to sue due to the

18

existence of the second unconstitutional rule. Stated otherwise, the greater the number of infirm statutes, the greater the insulation from federal review. Clearly, no court would accept this rationale, and Judge Kaplan erred in applying it here. Rather than allowing two unconstitutional statutes to shield one another from judicial review, the correct application of a ruling invalidating Rule 5.4 would be to likewise invalidate other state statutes, to the extent that they also serve as a blanket prohibition of non-lawyer investment in a law firm.

## POINT II:

### THE SOURCE OF PLAINTIFFS' INJURY IS THE BLANKET PROSCRIPTION OF NON-LAWYER INVESTMENT IN LAW FIRMS, WHICH VIOLATES THE FIRST AMENDMENT RIGHTS OF ASSOCIATION AND ACCESS TO THE COURTS

Rule 5.4 is an absolute proscription against non-lawyer investment in a law firm. The U.S. Supreme Court has repeatedly held that such blanket restrictions of First Amendment rights are unconstitutional. For example, in *Bates v. The State Bar of Arizona*, 433 U.S. 350 (1977), the Supreme Court invalidated Arizona's disciplinary rule prohibiting all attorney advertising. The Court acknowledged that some regulation of attorney advertising would be permissible, but that a blanket ban on such advertising violated the First Amendment. In explaining its decision, the Court noted that:

> In holding that advertising by attorneys may not be subject to blanket suppression, and that the advertisement at issue is protected, we, of

19

course, do not hold that advertising by attorneys may not be regulated in any way…We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like, might be required of even an advertisement of the kind ruled upon today so as to ensure the consumer is not misled.  In sum, we recognize that many of the problems in defining the boundary between deceptive and nondeceptive advertising remain to be resolved, and we expect that the bar will have a special role to play in assuring that advertising by attorneys flows freely and cleanly.

433 U.S. at 383-84.  Thus, the Court acknowledged the need for some regulation and the bar's role in crafting that regulation, but ultimately held that the "present application" of the rule, which barred *all* advertising, violated the First Amendment.  *Id*. at 384.

Similarly, in *Citizens United v. Federal Election Commission*, -- U.S. --, 130 S.Ct. 876 (2010), the Supreme Court held that "[t]he Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether."  130 S. Ct. at 886.  In overturning its own prior precedent, the Court ruled that "the Government may not suppress political speech on the basis of the speaker's corporate identity.  *No sufficient government interest justifies limits on the political speech of non-profit or for-profit corporations*."  *Id*. at 913 (emphasis added).

Here, Rule 5.4 serves as a blanket prohibition of Jacoby & Meyers' right to associate for the purpose of providing access to the courts for its clients.  The Rule provides, in relevant part, that "A lawyer shall not practice with or in the form of

an entity authorized to practice law for profit, if … a nonlawyer owns *any interest* therein." Thus, Rule 5.4 proscribes any equity ownership, no matter how passive, by a non-lawyer in a law firm.

Beginning with the seminal case of *NAACP v. Button*, 371 U.S. 415 (1963), the United States Supreme Court has long recognized that association for the purpose of providing access to the courts is a fundamental right under the First Amendment. In *Button*, the Supreme Court held that states could not ban the delivery of legal services through an arrangement involving the NAACP (a corporate entity), its affiliates, and lawyers.

The arrangement at issue in *Button* is instructive. The NAACP, a corporate entity authorized to do business in Virginia, had 89 branch offices in that state, organized into the Virginia State Conference of NAACP Branches (the "Conference"). *Id*. at 419. The activities of the Conference were financed by the NAACP corporate entity and local branches and the Conference, in turn, financed litigation aimed at ending racial segregation in Virginia. *See id.* at 419-20. The Conference maintained a staff of 15 attorneys and would ordinarily only finance an action if the litigant chose an NAACP attorney to represent him. *See id*. at 420.

In 1956, Virginia changed its anti-solicitation statute to prohibit solicitation of legal business by an agent for an individual or organization which retains a lawyer in connection with an action to which it is not a party and in which it has no

21

pecuniary right or liability. The Virginia Supreme Court held that the NAACP, the

Conference and the NAACP Defense Fund violated that statute as well as the ABA

Canons of Professional Ethics by fomenting and soliciting legal business in which

they were not parties and had no pecuniary right or liability. *Id.* at 424-426.

The U.S. Supreme Court reversed, holding that the First Amendment, as

applied to the states under the Fourteenth Amendment, protects the arrangement

under which NAACP attorneys, working as staff to the NAACP corporate entity,

may advise and represent prospective litigants notwithstanding Virginia's power to

regulate the legal profession and its prohibition on the improper solicitation of

legal business. *Id.* at 429. Importantly, *Button* established that the First

Amendment protects the delivery of legal services through an arrangement

between a nonprofit corporation and staff lawyers working for the nonprofit

corporation based upon the important free speech, association and petition interests

involved. As the Supreme Court noted, for a group such as the NAACP,

"association for litigation may be the most effective form of political association."

*Id.* at 431. Thus, the Court permitted the NAACP's legal delivery system whereby

a corporation was able to solicit clients to institute litigation and to prosecute the

litigation through its own staff lawyers.

The Supreme Court subsequently expanded its *Button* ruling beyond the

civil rights arena in *Brotherhood of Railroad Trainmen v. Virginia State Bar*, 377

U.S. 1 (1964).  There, the Court voided, on First Amendment grounds, an

injunction barring the Brotherhood, a trainworkers labor union, from advising

injured workers and the families of deceased workers to obtain legal advice from

recommended lawyers before settling any claims with the railroads.  The

arrangement violated Virginia's legal ethics rules, but the Supreme Court held that

those rules were trumped by the First Amendment protections.

> Specifically, the Court held that:

> A State could not, by invoking the power to regulate the professional
> conduct of attorneys, infringe in any way the right of individuals and
> the public to be fairly represented in lawsuits authorized by Congress
> to effectuate a basic public interest.  Laymen cannot be expected to
> know how to protect their rights when dealing with practiced and
> carefully counseled adversaries,…and for them to associate together
> to help one another preserve and enforce rights granted them under
> federal laws cannot be condemned as a threat to legal ethics.  The
> State can no more keep these workers from using their cooperative
> plan to advise one another than it could use more direct means to bar
> them from resorting to the courts to vindicate their legal rights.  The
> right to petition the courts cannot be so handicapped.

377 U.S. at 7 (internal citation omitted).

Similarly, in *United Mine Workers of America, Dist. 12 v. Illinois State Bar

Association*, 389 U.S. 217 (1967), the Supreme Court clarified that *Button* was not

limited only to political litigation.  The Court voided yet another injunction

obtained by a state bar organization which prohibited a union from hiring an

attorney to advise members in processing workers' compensation claims.  The

Court found that "the freedom of speech, assembly, and petition guaranteed by the First and Fourteenth Amendments give … the right to hire attorneys … to assist … in the assertion of … legal rights." *Id.* at 221-222.

*Button* and its progeny make clear that association for the purpose of providing access to court is a fundamental right which cannot be trumped by state regulation of the practice of law. As the Supreme Court has explained:

> The common thread running through our decisions in NAACP v. Button, Trainmen and United Mine Workers is that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment. However, that right would be a hollow promise if courts could deny associations of workers or others the means of enabling their members to meet the costs of legal representations.

*United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 585-586 (1971).

Here, consistent with *Bates* and *Citizens United,* in seeking to dismantle the prohibitions in rule 5.4, Jacoby & Meyers recognizes that it would be entirely appropriate, and necessary, for non-lawyer investment to be regulated. But what is not appropriate, and should not be countenanced by this Court, is the blanket suppression of non-lawyer investment that Rule 5.4 presently mandates. To hold otherwise is to deny Jacoby & Meyers its fundamental First Amendment rights to help ensure meaningful access to the courts for itself, as well as for the underserved and underprivileged segment of the community that it represents.

24

Indeed, the blanket restrictions of Rule 5.4 are currently suppressing Jacoby & Meyers' ability to represent its clients and enable their access to courts. Jacoby & Meyers has spent significant sums of money litigating this constitutional challenge to Rule 5.4 in order to vindicate its and its clients' First Amendment rights. This considerable cost has impacted both Jacoby & Meyers and its clients, as it has diverted resources from other applications and consumed valuable, but limited, capital which cannot easily (or at competitive rates) be replaced in light of Rule 5.4's proscriptions. Jacoby & Meyers should not be forced in this manner to choose between vindicating its constitutional rights and serving its clients.

While the impact of law firm financing upon client advocacy is palpable, the effect upon the firm itself can be cataclysmic. This week, in THE WALL STREET JOURNAL, the Brookings Institution made the direct link between the inability to obtain private investment and the demise of the firm of Dewey & LeBoeuf:

> While law firms can and do get bank loans, ABA regulations prohibit banks, private-equity firms or other corporations from owning or having an ownership stake in a law firm. This limits a law firm's financing options and raises its capital costs. Dewey's collapse has been attributed to the firm being highly leveraged and unable to attract investment from businesses outside the legal profession.

Clifford Winston and Robert W. Crandall, *The Law Firm Business Model Is Dying*, THE WALL STREET JOURNAL, May 29, 2012, at A13.

25

## POINT III:

## JUDICIARY LAW SECTION 495 AND THE LIMITED LIABILITY COMPANY LAW DO NOT PROHIBIT JACOBY & MEYERS <u>FROM ACCEPTING NON-LAWYER INVESTMENTS</u>

If Rule 5.4 were found to be an unconstitutional blanket suppression of Jacoby & Meyers' First Amendment rights – as it should be – the doctrine of federal supremacy would render Judiciary Law Section 495, as applied to prohibit the same behavior, similarly unconstitutional. Moreover, even if the doctrine of federal supremacy did not necessarily render Section 495 unconstitutional, Section 495 does not prohibit the investment contemplated by Jacoby & Meyers.

**A.** **Judiciary Law Section 495 Does Not Prohibit Jacoby & Meyers LLC From Accepting Non-Lawyer Equity Investments**

Judiciary Law Section 495 does not address passive ownership interests in law firms and cannot be fairly applied to prohibit such an interest in law firms. Section 495's prohibition against a corporation or voluntary association from, among other things, practicing law does not apply to any corporation or voluntary association "lawfully engaged in a business authorized by the provisions of any existing statute." N.Y. JUD. L. § 495(4). Jacoby & Meyers LLC fits within the exception identified in Section 495(4) because it is authorized to practice law pursuant to Section 201 of the New York Limited Liability Law ("New York LLC Law").

26

The New York LLC Law allows attorneys to form an LLC for the purpose of rendering legal services. Indeed, Section 201 of the LLC Law provides that:

> A limited liability company may be formed under this chapter for *any lawful business purpose* or purposes except to do in this state any business for which another statute specifically requires some other business entity or natural person to be formed or used for such business.

N.Y. LTD. LIAB. CO. LAW § 201 (emphasis added).

In concluding that the practice of law is not a "lawful business purpose" as intended under the New York LLC Law, the district court relied on *In re Co-operative Law Co.,* 198 N.Y. 479 (1910), a case interpreting the New York Business Corporation Law ("BCL") in effect in 1910, 84 years before the New York LLC Law was enacted. *See* N.Y. LTD. LIAB. CO. LAW § 101, *et seq.* The court's analysis in *Co-operative Law Co.*, places into sharp focus how distinct it is from the case at bar.

In *Co-operative Law Co.,* the Court of Appeals analyzed whether a corporation organized for the purpose of engaging in the practice of law constituted a "lawful business" that could be excluded from the statutory prohibition forbidding corporations from practicing law. 198 N.Y. at 484. The Court of Appeals concluded that because a corporation cannot perform the conditions that an individual must meet to practice law (*i.e.,* completing long course of study, examination by a state board, taking oath of office, being subject

27

to discipline, suspension or removal), the practice of law was not a "lawful business" for a corporation to engage in. *Id.* at 483. Importantly, unlike here, the BCL provision at issue in *Co-operative Law Co.* did not define "any lawful business" to include attorneys, a failure relied upon heavily by the Court of Appeals in its ruling:

> The legislature in authorizing the formation of corporations to carry on 'any lawful business' did not intend to include the work of the learned professions. Such an innovation with the evil results that might follow would require the use of specific language clearly indicating that intention.

*Id.* at 484. Here, unlike the BCL provision at issue in *Co-operative Law Co.,* the New York LLC Law specifically defines a "lawful business purpose" to include "professions" (*see* N.Y. LTD. LIAB. CO. LAW § 102 ("'[b]usiness' means *every* trade, occupation, *profession* or commercial activity")) (emp. supplied) which includes the practice of law. *See Bailey v. Broder*, No. 94 CIV. 2394 (CSH), 1997 WL 73717 at *3 (S.D.N.Y. Feb. 20, 1997) ("the practice of law is a profession"). This "specific language clearly indicating the [legislature's] intention" satisfies the Court of Appeals' call for such language in *Co-operative Law. Id.*

Moreover, the relevancy of *Co-operative Law* is undermined by the fact that the perception and treatment of corporations has changed markedly since *Co-operate Law* was decided, as has the corporate form generally. Since then, the

28

Supreme Court has acknowledged that corporations have constitutional rights once intended to protect only natural persons. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765 (1978) (corporations entitled to First Amendment protections); *Fong Foo v. United States*, 369 U.S. 141 (1962 (corporations entitled to Fifth Amendment protections); *Citizens United*, -- U.S. --, 130 S. Ct. 876 (corporate political speech may not be suppressed).

In addition, entities may now form as an LLC, a corporate form that did not exist at the time *Co-operative Law* was decided and subsequent case law has made clear that LLCs and corporations are to be treated differently. *See e.g.* 28 U.S.C. 1332(c)(1) (LLCs treated differently than corporations for purposes of diversity jurisdiction); N.Y. TAX LAW § 658 (LLC can elect to be treated as a corporation and taxed at the corporate level or as a partnership where individual members are taxed); New York State Board of Elections 2011 Campaign Financial Handbook (http://www.elections.ny.gov/NYSBOE/download/finance/hndbk2011.pdf (LLCs treated as individuals for purposes of limitations on campaign contributions).

For all of these reasons, wholly ignored by the district court, *Co-operative Law Co.* is inapplicable to the instant case and its holding does not "control this case" as determined by the district court. (D. 12).

29

**B.**    **The Option to Form a Professional Service Limited Liability Company to Practice Law Does not Preclude a Limited Liability Company From Practicing Law**

The district court similarly erred in concluding that the existence of the *option* of forming a professional service limited liability company ("PSLLC") to practice law undermines Jacoby & Meyers' contention that an LLC is permitted to practice law.  *See* N.Y. LTD. LIAB. CO. LAW § 1201, *et seq.*   Nowhere in the LLC Law (including Article 12 governing PSLLCs), is it required that attorneys *must* form a PSLLC to practice law.  *See, e.g.*, N.Y. LTD. LIAB. CO. LAW § 1203(a) (emphasis added) (stating that professionals "*may*" form a PSLLC).  The Statute's use of the permissive "may" instead of the mandatory "shall" indicates that there is *no* mandatory requirement that companies wishing to engage in a profession must form as a PSLLC.  *See, e.g.*, *Sullivan v. Town of Salem*, 805 F.2d 81, 84 (2d Cir. 1986) (a statute permits discretion regarding an activity where the statute uses "a discretionary 'may', not a mandatory 'shall'"); *Eli v. Apker*, No. 05 CIV. 2703 (DC), 2005 WL 2848956 at *5 (S.D.N.Y. Oct. 28, 2005) (a statute's "use of the permissive 'may' rather than the mandatory 'shall'" indicates that the statute confers discretion); *F & W Oldsmobile, Inc. v. Tax Comm'n*, 106 A.D.2d 792, 792-93 (3d Dep't 1984) ("The language of the statute uses the mandatory 'shall' rather than the permissive 'may'").  Rather, both corporate forms are permitted for law firms, and each form has advantages and drawbacks.  For example, the LLC

30

provisions permit non-lawyers to have an ownership interest in the entity, while the PSLLC provisions do not.  N.Y. LTD. LIAB. CO. LAW § 602 (stating that "a person may become a member" and containing no restrictions on ownership); *See, e.g.*, *Pappas v. Tzolis*, 87 A.D.3d 889, 889 (1st Dep't 2011) (describing a non-professional owner of an LLC). Similarly, an LLC may not use the words "attorney" or "lawyer" or any abbreviation or derivative thereof in its name, whereas the name of a PSLLC may contain those terms.   N.Y. LTD. LIAB. CO. LAW §§ 204, 1212.

For all of these reasons, the district court's holding that Jacoby & Meyers lacks standing to challenge the constitutionality of Rule 5.4 is erroneous and should be reversed.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Jacoby & Meyers respectfully submits that this Court should reverse the district court's dismissal of Jacoby & Meyers' Amended Complaint and remand this action to the district court, together with such other and further relief as the Court deems just and warranted.

Dated:     White Plains, New York
          May 31, 2012

                    Respectfully submitted,

                    MEISELMAN, DENLEA, PACKMAN,
                    CARTON & EBERZ P.C.

          By:      /s/ James R. Denlea
                    James R. Denlea (JD-4610)
                    Jeffrey I. Carton (JC-8296)
                    1311 Mamaroneck Avenue
                    White Plains, New York 10605
                    Tel: (914) 517-5000
                    *Attorneys for Plaintiffs-Appellants*

32

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance With Type-Volume Limitation,
<u>Typeface Requirements, and Type Style requirements</u>

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,519 words.

2.     This brief complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman type style.


Dated:       White Plains, New York
              May 31, 2012

                        MEISELMAN, DENLEA, PACKMAN,
                        CARTON & EBERZ P.C.

               By:      <u>  /s/ James R. Denlea     </u>
                     James R. Denlea (JD-4610)
                     Jeffrey I. Carton (JC-8296)
                     1311 Mamaroneck Avenue
                     White Plains, New York 10605
                     Tel: (914) 517-5000
                     *Attorneys for Plaintiffs-Appellants*

00249308-9.doc

33

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Memorandum Opinion of the Honorable Lewis A.
  Kaplan, dated March 8, 2012.................................   SPA-1

Judgment, dated March 14, 2012, Appealed From ....   SPA-19

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JACOBY & MEYERS, LLP and JACOBY & MEYERS
USA, LLC,

     Plaintiffs,

    -against-         11 Civ. 3387 (LAK)

THE PRESIDING JUSTICES OF THE FIRST, SECOND,
THIRD AND FOURTH DEPARTMENTS, APPELLATE
DIVISION OF THE SUPREME COURT OF THE STATE
OF NEW YORK,

     Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

     David J. Meiselman
     James R. Denlea
     Jeffrey I. Carton
     MEISELMAN, DENLEA, PACKMAN, CARTON & EBERZ, P.C.
     *Attorneys for Plaintiffs*

     Daniel A. Schulze
     Michael J. Siudzinski
     Assistant Attorneys General
     ERIC T. SCHNEIDERMAN
     ATTORNEY GENERAL OF THE STATE OF NEW YORK
     *Attorneys for Defendants*

2

LEWIS A. KAPLAN, *District Judge.*

Lawyers in the United States are not now permitted to obtain equity investments in their practices from non-lawyers, which precludes them from, among other things, selling stock in their practices to the public. The law firm of Jacoby & Meyers, LLP ("J&M")[1] and an affiliate here seek a declaration that Rule 5.4 of the Model Code of Professional Conduct, as adopted in New York, which is among the New York laws and regulations that embody that principle, is unconstitutional.[2] They argue that the prohibition on non-lawyer equity investment imposes higher capital costs and thus impairs their ability to expand what they characterize as their mission to provide lower cost legal services to those who cannot afford more traditional lawyers.

The advisability of allowing non-lawyer equity investment and, perhaps ultimately, public offerings of shares in law practices has become a much debated topic. Permitting it, as J&M contends, conceivably might broaden the availability and lower the cost of legal services without serious adverse consequences. On the other hand, it instead might prove to be "a deal with the devil," as some have argued was the case when traditionally private investment banking partnerships went public.[3] But those, at least in the first instance, are issues for the legislatures and professional rule-setting bodies that govern lawyer conduct. The issue before this Court on defendants' motion

---

[1]  The original complaint in this action identified the plaintiff as Jacoby & Meyers Law Offices, LLP. According to an official record of the New York Department of State, the firm was organized under that name but changed its name in 2000 to Jacoby & Meyers, LLP. The caption was amended accordingly. DI 19.

[2]  Amended Complaint ("Cpt") ¶¶ 52-80. The original complaint included various state law and other claims which are not included in the amended complaint. DI 1.

[3]  *E.g.*, James Surowiecki, *Public Humiliation*, NEW YORKER, Sept. 29, 2008, at 30, *available at* http://www.newyorker.com/talk/financial/2008/09/29/080929ta_talk_surowiecki.

SPA-3

3

to dismiss is far more limited – whether plaintiffs have standing to raise the constitutional claims they advance.

The fundamental problem is this. Rule 5.4 is not the only provision of New York law that forecloses plaintiffs from receiving non-lawyer equity investment. But plaintiffs challenge only Rule 5.4. Indeed, they explicitly disclaim any challenge to other provisions of New York law,[4] each of which independently would prevent them from doing what they say they wish to do. Thus, plaintiffs could not accept non-lawyer equity investments even if they won on the merits of their constitutional claims. Plaintiffs therefore could not, consistent with New York law, practice law and accept equity investments from non-lawyers even if Rule 5.4 were declared unconstitutional. Hence, the ruling that they seek would be a purely advisory declaration of the sort that is forbidden to federal courts under Article III of the U.S. Constitution.

*Facts*

*Rule 5.4*

The starting point for this motion is Rule 5.4 of the New York Rules of Professional Conduct, which provides in relevant part, with exceptions not pertinent to this case:

"(a) A lawyer or law firm shall not share legal fees with a nonlawyer . . .

\*   \*   \*

"(d) A lawyer shall not practice with or in the form of an entity authorized to practice law for profit, if:

---

[4]

Tr., Nov. 3, 2011, at 22, 24.

Case 12-1377, Document 31, 05/31/2012, 624584, Page46 of 62

4

"(1) a nonlawyer owns any interest therein . . . ."[5]

*The Parties*

    *Plaintiffs*

        There now are two plaintiffs in this case, J&M and Jacoby & Meyers USA, LLC

("J&M LLC").  J&M LLC allegedly was formed "for the express purpose of allowing non-lawyers

to 'own an interest' in the entity through which [J&M] is authorized to practice law for profit."[6]

    *J&M*

        J&M is a New York-based law firm with eleven offices around the state, offices in

Connecticut and New Jersey, and affiliates of some undescribed sort in California, Alabama,

Florida, and Arizona, perhaps among other states.[7]  It allegedly employs "nearly 100 professionals"[8]

and is a limited liability partnership registered under Article 8-B of the New York Partnership Law.[9]

As registration is limited, in relevant part, to "partnership[s] without limited partners," each of

whom is a professional in the relevant field,[10] all of J&M's partners must be lawyers.  Its partners

---

[5]

    22 N.Y.C.R.R. § 1200.0, Rule 5.4.

[6]

    Cpt ¶ 14.

[7]

    *Id.* ¶¶ 13, 29.

[8]

    *Id.* ¶ 13.

[9]

    Registration is a prerequisite to the limitation of liability that is the attraction of the limited
liability partnership form.  N.Y. P'SHIP LAW § 26(b).

[10]

    *See id.* § 121-1500(a)(I).

SPA-5

5

therefore are subject to Rule 5.4 either as members of the New York Bar or, if admitted to practice only elsewhere, to the extent those individuals perform legal services in New York.[11]

### J&M LLC

J&M LLC is a limited liability company under New York law and was formed in response to defendants' argument that the original complaint should be dismissed because J&M lacked standing.[12]  According to the amended complaint, J&M "is prepared immediately to transfer all of its assets to [J&M LLC] and immediately obtain non-lawyer investment – as soon as Rule 5.4's blanket suppression of non-lawyer ownership of an interest in law firms is declared unconstitutional and its enforcement permanently enjoined."[13]

### Defendants

Defendants are the presiding justices of the Appellate Division of the New York Supreme Court for each of its four departments.  According to the amended complaint, they or their predecessors promulgated Rule 5.4, and they are responsible under state law for its implementation and enforcement.[14]

---

[11] 22 N.Y.C.R.R. § 1200.0, Rule 8.5.

[12] Defendants argued that J&M lacked standing because the New York Partnership Law provides that limited liability partnerships must be "partnership[s] without limited partners," each of whom is a professional in the relevant field. N.Y. P'SHIP LAW § 121-1500(a)(I).

[13] Cpt ¶ 14.

[14] *Id.* ¶ 15.

**SPA-6**

6

*Plaintiffs' Alleged Standing*

The amended complaint goes on at some length with respect to what plaintiffs characterize, perhaps hyperbolically, as J&M's "pioneer[ing]" efforts to provide "legal services for the masses."[15] As the present motion turns principally on the question of whether J&M and J&M LLC have standing to challenge Rule 5.4, it suffices to address the allegations relevant to that subject.

The amended complaint asserts that J&M "requires a substantial infusion of new capital."[16] Traditional means of obtaining the necessary funds, such as capital contributions by partners and commercial bank loans, however, allegedly are too expensive or are unavailable to fund its business plans.[17] At one point, it asserts that Rule 5.4 has prevented it from "entertain[ing] the numerous offers it has received from prospective non-lawyer investors . . . who are prepared to invest capital in exchange for owning an interest in the firm."[18] The amended complaint lists also a handful of "high net-worth individuals . . . [who] have expressed their commitment to invest

---

In fact, New York Judiciary Law § 90, subd. 2, vests "power and control over attorneys and counsellors-at-law" in the Supreme Court generally, with the power to discipline attorneys being conferred upon its Appellate Divisions. McKinney's Consolidated Laws state that the Rules of Professional Conduct were adopted by the Justices of the Supreme Court, Appellate Division. 29 MCKINNEY'S CONSOL. LAWS OF N.Y. ANN., Rules DR 2-107 to End, at 143 (Supp. 2011). The assertion that the presiding justices are responsible for the implementation and enforcement of the Rules of Professional Conduct, at least to the extent that the assertion implies that each of them alone bears such responsibility, thus appears to be directly at odds with the controlling statute.

[15]    Cpt ¶¶ 22-30.

[16]    *Id.* ¶ 33.

[17]    *Id.* ¶¶ 33-34.

[18]    *Id.* ¶ 34.

Case 12-1377, Document 31, 05/31/2012, 624584, Page49 of 62

significant sums of money in [J&M] in exchange for owning an interest . . . in the entity through which [J&M] practices law."[19]  Elsewhere it alleges that "[b]ut for the proscriptions of Rule 5.4 . . . [J&M] would have already consummated these investments and allowed non-lawyers to own an interest in the legal entity through which it practices law."[20]

## Discussion

Standing is an essential prerequisite to Article III jurisdiction.  The standing inquiry has three elements: a "plaintiff must allege [1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief."[21]  Put another way, a plaintiff must allege an "injury in fact" that is (1) "concrete," "particularized," and "actual or imminent," (2) "fairly traceable to the challenged action of the defendant," and (3) redressable "by a favorable decision."[22]

Although a plaintiff must allege all three elements of Article III standing to establish federal jurisdiction, the central issue here involves the second and third elements.[23]  Simply put, the critical questions are whether Rule 5.4 is causing plaintiffs' alleged injury and whether the ruling

---

[19]     *Id.* ¶ 35.

[20]     *Id.* ¶ 36.

[21]     *Allen v. Wright*, 468 U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[22]     *Lujan*, 504 U.S. at 560-61.

[23]     Defendants do not argue that plaintiffs fail to allege an actual injury in the amended complaint.  DI 27.

they seek, a declaration that Rule 5.4 is unconstitutional, would eliminate it. Plaintiffs argue that both questions should be answered affirmatively because Rule 5.4 prohibits them from obtaining non-lawyer equity investment and because it is the only such obstacle. Defendants, on the other hand, contend that J&M and J&M LLC are foreclosed by the New York Partnership Law and Section 495 of the Judiciary Law, respectively, from accepting equity investments from non-lawyers.[24] Because defendants argue that these statutes prohibit plaintiffs' proposed non-lawyer equity investment regardless of Rule 5.4, they assert that plaintiffs have failed to allege that Rule 5.4 caused their injury or that invalidating it would redress any such injury.

The Court addresses the situation of each plaintiff separately.

*J&M LLC*

Section 495 of the Judiciary Law, which is entitled "Corporations and voluntary associations not to practice law," provides in relevant part:

"1.   No corporation or voluntary association shall

(a) practice or appear as an attorney-at-law for any person in any court in this state or before any judicial body, nor

(b) make it a business to practice as an attorney-at-law, for any person, in any of said courts, nor

(c) hold itself out to the public as being entitled to practice law, or to render legal services or advice, nor

(d) furnish attorneys or counsel, nor

---

[24]   As the Court finds arguments related to Judiciary Law § 495 and New York's Partnership Law dispositive, it does not consider whether plaintiffs' proposed non-lawyer equity investment would violate other provisions of the Judiciary Law as defendants assert. DI 26, at 8-9.

(e) render legal services of any kind in actions or proceedings of any nature or in any other way or manner, nor

(f) assume in any other manner to be entitled to practice law, nor

(g) assume, use or advertise the title of lawyer or attorney, attorney-at-law, or equivalent terms in any language in such manner as to convey the impression that it is entitled to practice law or to furnish legal advice, services or counsel, nor

(h) advertise that either alone or together with or by or through any person whether or not a duly and regularly admitted attorney-at-law, it has, owns, conducts or maintains a law office or an office for the practice of law, or for furnishing legal advice, services or counsel."

*   *   *

4.      "Subdivisions one and two of this section shall not apply to any corporation or voluntary association lawfully engaged in a business authorized by the provisions of any existing statute."

*   *   *

7.      "This section does not apply to organizations which offer pre-paid legal services . . . or to organizations which have as their primary purpose the furnishing of legal services to indigent persons."[25]

Plaintiffs argues first that Section 495 perhaps does not apply to J&M LLC because the statute applies only to "corporation[s] and voluntary association[s]," whereas J&M LLC is a limited liability company.[26]   Assuming *arguendo* that the statute applies to limited liability companies, however, they argue that J&M LLC would be exempt because it would (1) be "lawfully engaged in a business" under New York's Limited Liability Company Law, and (2) provide pre-paid

---

[25]   N.Y. JUD. LAW § 495.

[26]   The Court notes that this argument is made only in a footnote, DI 29, at 14 n.5, and therefore properly may be disregarded. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

**SPA-10**

10

legal services or have the provision of services to the indigent as its primary purpose, thus coming within subdivision 4 and/or 7 of Section 495.

### Applicability of Section 495 to Limited Liability Companies

Assuming for the purposes of discussion that the suggestion that Section 495 perhaps might not apply to limited liability companies were properly before the Court, the suggestion would be without merit.

As an initial matter, this is not a question of first impression under Section 495. In *In re Garas*,[27] at attorney formed a limited liability company, RCS, with a non-lawyer for the purpose of bidding on contracts with the United States Department of Housing and Urban Development to provide closing services on the sale of previously foreclosed properties.[28] Nonlawyer employees of RCS prepared deeds and attended closings on its behalf under limited supervision of the attorney.[29]  The Appellate Division held that the services provided by RCS constituted the practice of law and that its attorney member had violated Section 495 by, among other things, "forming a corporation with a nonlawyer for the provision of those services."[30]  The case therefore stands for the proposition that a limited liability company is a "corporation or voluntary association" within the meaning of Section 495 of the Judiciary Law.

---

[27]

65 A.D.3d 164, 881 N.Y.S.2d 744 (4th Dept. 2009).

[28]

*Id.* at 165.

[29]

*Id.*

[30]

*Id.* at 167.

Case 12-1377, Document 31, 05/31/2012, 624584, Page53 of 62

Nor does *Garas* stand alone.  The phrase "corporation or voluntary association" appears elsewhere in New York statutes, notably Section 321 of the Civil Practice Law and Rules. That statute forbids corporations and voluntary associations from appearing in litigation *pro se*, requiring "that a corporation or voluntary association shall appear by attorney."[31]  And in *Carlo v. Yorro,*[32] among other cases, the court held that "[l]imited liability companies have the attributes of a voluntary association with corporate limited liability protection and therefore should be treated as such for the purposes of CPLR § 321(a)."[33]

Accordingly, even if plaintiffs had not waived the point, this Court would hold that J&M LLC is a "corporation or voluntary association" within the meaning of Judiciary Law Section 495.

### *The Limited Liability Company Law*

Plaintiffs argue that J&M LLC in any case would be exempt from Section 495 if it began practicing law because it would be lawfully engaged in a business under New York's Limited Liability Company Law ("LLC Law") and thus exempted by Section 495, subd. 4.

This argument relies on Section 201 of the LLC Law, which provides that a "limited

---

[31]    N.Y. CPLR § 201(a).

[32]    195 M.2d 762, 761 N.Y.S.2d 766 (Dist. Ct. Nassau Co. 2002).

[33]    195 M.2d at 766.  *Accord, Chase Bank USA, N.A. v. Cardello*, 27 M.3d 791, 792, 896 N.Y.S.2d 856 (N.Y. Civ. Ct. Richmond Co. 2010); *see In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 315 (S.D.N.Y. 2008) (LLC is a "corporation" under indenture defining "corporation" to include corporations and voluntary associations, among other forms).

12

liability company may be formed under the chapter for any lawful business purpose . . . ."[34] Simply put, plaintiffs assert that the "any lawful business purpose" language in the LLC Law would allow J&M LLC lawfully to engage in the practice law and thus exempt it from Section 495. Plaintiffs, however, overlook the fact that more than a century ago, the New York Court of Appeals, in *In re Co-operative Law Co.*,[35] interpreted the phrase "any lawful business purpose" in New York's Business Corporations Law to exclude the "learned professions," including the practice of law.[36]

*In re Co-operative Law Co.* involved a situation quite similar to this one. There, a corporation argued that a statute prohibiting corporations from practicing law[37] did not apply to it because it was authorized to practice law under a provision of the New York's Business Corporations Law that provided that a corporation could be formed for "any lawful business purpose."[38] The New York Court of Appeals, however, rejected that argument and held that the practice of law was "not a lawful business except for members of the bar who have complied with all the conditions required by statute and the rules of the courts."[39] Plaintiffs offer no persuasive basis for concluding that the holding of *In re Co-operative Law Co.* does not control this case.

---

[34]   N.Y. LTD. LIAB. CO. LAW. § 201.

[35]   198 N.Y. 479 (1910).

[36]   *Id.* at 484.

[37]   Section 495 was derived from the statute at issue in *In re Co-operative Law Co.*

[38]   *Id.* at 483.

[39]   *Id.* ("The legislature in authorizing the formation of corporations to carry on 'any lawful business' did not intend to include the work of the learned professions. Such an innovation with the evil results that might follow would require the use of specific language clearly indicating the intention.").

Case 12-1377, Document 31, 05/31/2012, 624584, Page55 of 62

13

Moreover, any doubt on the point, and this Court finds none, would be dispelled by another feature of the LLC Law.

Section 204(b)(2)(f) of the LLC Law provides that limited liability company names cannot include the words "attorney" or "lawyer" or any derivation thereof "unless the word or abbreviation . . . clearly denotes a purpose other than the practice of law."[40] Moreover, certain definitions in the statute suggest that law firms must be organized as professional services limited liability companies ("PSLLCs"), instead of as limited liability companies generally, to practice law in New York.[41] Section 1201 defines "profession" as "any practice as an attorney and counselor-at-law" and defines "professional" as "an individual duly authorized to practice a profession, a professional service corporation, a professional service limited liability company, a foreign professional service limited liability company, a registered limited liability partnership, a foreign limited liability partnership, a foreign professional service corporation or a professional partnership."[42] Accordingly, the LLC Law reflects the fact that the Legislature accepted the applicability of the holding of *In re Co-operative Law Co.* to limited liability companies as a premise of the statute, as any other view would render inexplicable these provisions of the statute.

Finally, the very existence of PSLLCs undermines plaintiffs' argument that any limited liability company is permitted to practice law. If law firms could organize themselves and

---

[40] N.Y. LTD. LIAB. CO. LAW § 204(b)(2)(f).

[41] The statute authorizes PSLLCs to practice law in New York. *Id.* § 1203.

For clarity, the Court notes that PSLLCs, like limited liability companies generally, are allowed to use the abbreviation "LLC" in their names. *Id.* § 1212(b).

[42] *Id.* § 1201.

Case 12-1377, Document 31, 05/31/2012, 624584, Page56 of 62

14

practice law as limited liability companies generally, they never would organize themselves as PSLLCs because PSLLCs are subject to greater restrictions,[43] have great potential liabilities,[44] and receive no meaningful benefits.[45]

The Court therefore holds that limited liability companies generally – as opposed to PSLLCs – may not lawfully practice law in New York.[46]  J&M LLC would not be exempt from Section 495 on the theory plaintiffs advance.

*Pre-Paid Legal Services*

Plaintiffs' final argument is that J&M LLC would be exempt from Section 495 because it would provide pre-paid legal services and/or that its primary purpose would be to provide legal services to indigent people.  This argument fails for two reasons.

---

[43]  *See id.* §§ 1203, 1204, 1206, 1207, 1209.

[44]  *See id.* § 1205.

[45]  The only "benefit" PSLLCs receive is the ability to use the term "lawyer" or "attorney" in their names. *Id.* §§ 204(b)(2)(f), 1212.

[46]  Even assuming that J&M LLC had been organized as a PSLLC, it would lack standing because all members owning an interest in a PSLLC – like partners in a limited liability partnership – must be licensed professionals in the relevant field of practice. *E.g.*, *id.* § 1203. As J&M LLC seeks to allow non-lawyers to invest and 'own an interest' in the entity, the statutory provisions governing PSLLCs would bar this type of transaction regardless of Rule 5.4.

Furthermore, defendants argue that J&M LLC cannot be registered as a PSLLC because it did not comply with the requirements necessary to register as a PSLLC under New York law. *See* DI 27, at 7-8; N.Y. LTD. LIAB. CO. LAW § 1203(b) (outlining the filing requirements for PSLLCs). As J&M LLC could not sufficiently allege standing even if it were considered a PSLLC, the Court need not decide the merits of defendants' contentions regarding J&M LLC's filings.

**SPA-15**

15

First, there is nothing in the amended complaint that supports either assertion. Indeed, not even their memorandum suggests that J&M LLC's primary purpose would be to provide legal services to the indigent, and there are no factual allegations as to what its memorandum means by pre-paid legal services.[47]

Second, an entity seeking to provide pre-paid legal services or the primary purpose of which is to provide legal services to the indigent must file with the Appellate Division a statement "describing the nature and purposes of the organization, the composition of its governing body, the types of legal services being made available, and the names and address of any attorneys and counselors-at-law employed by the organization . . . ."[48] But there is no allegation that J&M LLC has filed such a statement. J&M LLC therefore cannot be considered an organization exempt from Section 495 under subdivision 7.[49]

In sum, Section 495 prohibits the practice of law by a corporation or voluntary association unless it falls within one of a few specified exceptions. J&M LLC is a corporation or voluntary association within the meaning of the statute. Although it argues that it falls within two of the statutory exceptions, its arguments are not persuasive. Section 495 thus bars J&M LLC from practicing law, irrespective of Rule 5.4. J&M LLC lacks standing because it fails to allege that Rule 5.4 caused or is causing its alleged injury or that invalidating that Rule would redress any such injury.

---

[47]

  Furthermore, the amended complaint does not allege that J&M currently provides pre-paid legal services or that its primary purpose is to provide legal services to the indigent.

[48]

  N.Y. JUD. LAW § 496; *see* DI 31, at 5.

[49]

  *See Feinstein v. Att'y Gen. of N.Y.*, 326 N.E.2d 288, 36 N.Y.2d 199, 199 (1975).

Case 12-1377, Document 31, 05/31/2012, 624584, Page58 of 62

16

*J&M*

J&M argued in opposition to the defendants' motion to dismiss the original complaint that New York's Partnership Law would not prohibit it, as a registered limited liability partnership, from practicing law, even if it admitted non-lawyer equity investors.[50]  Although plaintiffs' papers on the present motion argue that both plaintiffs have standing, plaintiffs no longer advance the argument originally made on behalf of J&M and thus appear to have abandoned it.  They now argue only that J&M LLC is not prohibited by Judiciary Law Section 495 from practicing law and receiving non-lawyer equity investment.[51]  Nevertheless, for the sake of completeness, the Court turns next to that now-abandoned argument, viz. that New York's Partnership Law does not bar J&M, as a limited liability partnership, from receiving outside equity investment from non-lawyers.

As an initial matter, Section 121-1500(a) of the Partnership Law, which applies to registered limited liability partnerships, provides in relevant part that:

> "Notwithstanding . . . any other provision of law, (i) a partnership without limited partners each of whose partners is a professional authorized by law to render a professional service within this state and who is or has been engaged in the practice of such profession in such partnership or a predecessor entity, or will engage in the practice of such profession in the registered limited liability partnership within thirty days of the date of the effectiveness of the registration provided for in this subdivision . . . may register as a registered limited liability partnership."[52]

Registration as a limited liability partnership is contingent upon, among other conditions, (a) each

---

[50]  DI 15, at 18.

The motion addressed to the original complaint was mooted by the filing of the amended complaint.

[51]  *Id.* at 13-15.

[52]  N.Y. P'SHIP LAW § 121-1500(a).

Case 12-1377, Document 31, 05/31/2012, 624584, Page59 of 62

partner being "a professional authorized by law to render a professional service within this state," and (b) the absence of any limited partners.[53] Thus, if J&M allowed a non-lawyer to own an equity interest in the firm, it could not operate as a limited liability partnership.[54]

Although it is unclear if any additional statutes – beyond Rule 5.4 – would prevent non-lawyers from owning an interest in another type of partnership, J&M has not alleged or suggested that it would be willing to give up the advantage of limited liability or that it ever would operate as another type of partnership.  The Court therefore need not consider whether a law firm operating as another type of partnership and seeking non-lawyer equity investment would have standing to challenge Rule 5.4.

Assuming *arguendo* that J&M's original argument had not been abandoned, it nevertheless would lack standing here because it fails to allege that Rule 5.4 caused its alleged injury or that invalidating the Rule would redress any such injury.

### Conclusion

For the foregoing reasons, defendants' motion to dismiss the amended complaint for lack of subject matter jurisdiction [DI 26] is granted.  Moreover, even if this Court perceived that

---

[53]

The conditions must continue to be satisfied for registration to remain effective. *See id.* § 121-1500(g).

[54]

*Id.*

Case 12-1377, Document 31, 05/31/2012, 624584, Page60 of 62

18

the state statutes at issue here were unclear,[55] it would have abstained under *Pullman*[56] and stayed the action pending a state court resolution of the state law issues.

SO ORDERED.

Dated:          March 8, 2012

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[55]    *See* THE FEDERALIST, NO. 37, at 164-65 (James Madison) (Clinton Rossiter ed., 1961) ("When the Almighty himself condescends to address mankind in their own language, his meaning, luminous as it must be, is rendered dim and doubtful by the cloudy medium through which it is communicated.").

[56]    *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941). *Pullman* abstention is warranted when: (1) an unclear state law exists, (2) a federal constitutional issue depends on interpreting the state law, and (3) the state law can be interpreted in a manner that would avoid or modify the federal constitutional issue. *See Greater N.Y. Metro. Food Council v. McGuire*, 6 F.3d 75, 77 (2d Cir. 1993).

**SPA-19**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
JACOBY & MEYERS, LLP and JACOBY &
MEYERS USA, LLC,

                Plaintiffs,

        -against-

THE PRESIDING JUSTICES OF THE FIRST,
SECOND, THIRD AND FOURTH DEPARTMENTS,
APPELLATE DIVISION OF THE SUPREME
COURT OF THE STATE OF NEW YORK,
                Defendants.
-------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   3/14/12
```

11 **CIVIL** 3387 (LAK)

**JUDGMENT**

Defendants having moved to dismiss, and the matter having come before the Honorable

Lewis A. Kaplan, United States District Judge, and the Court, on March 8, 2012, having rendered

its Memorandum Opinion granting defendants' motion to dismiss the amended complaint for lack

of subject matter jurisdiction, it is,

      **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Opinion dated March 8, 2012, defendants' motion to dismiss the amended

complaint for lack of subject matter jurisdiction is granted.

**Dated:** New York, New York
       March 14, 2012

                          **RUBY J. KRAJICK**

                           **Clerk of Court**

         **BY:**

                           **Deputy Clerk**

              THIS DOCUMENT WAS ENTERED
              ON THE DOCKET ON _____

STATE OF NEW YORK      )
                       )          ss.:        **AFFIDAVIT OF**
COUNTY OF NEW YORK     )                      **CM/ECF SERVICE**


      I, Kersuze Morancy, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age.


      **On May 31, 2012**

deponent served the within: **Brief and Special Appendix for Plaintiffs-Appellants**

      **upon:**

**OFFICE OF THE ATTORNEY GENERAL**
  **OF NEW YORK**
**WON S. SHIN**
***Attorney for Defendant-Appellee***
**120 Broadway**
**New York, New York 10271**
**(212) 416-8050**

via the CM/ECF Case Filing System. All counsel of record in this case are registered CM/ECF users. Filing and service were performed by direction of counsel.


**Sworn to before me on May 31, 2012**

                                          _____

  **MARIANA BRAYLOVSKAYA**
  Notary Public State of New York
      No. 01BR6004935
   Qualified in Richmond County
 Commission Expires March 30, 2014

                          **Job #242142**